T.C. Memo. 2010-134

UNITED STATES TAX COURT

KAREN MARIE WILSON, Petitioner <u>v</u>. COMMISSIONER OF INTERNAL
REVENUE, Respondent

Docket No. 23882-04.                    Filed June 17, 2010.

<u>Katherine J. Evans</u> and <u>Philip A. O'Connell, Jr.</u>, for
petitioner.

<u>Thomas Greenaway</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Lloyd Wilson was up to no good in 1997 and
1998.  His previously modest income had skyrocketed in less than
two years' time.  He moved much of the money offshore--including
one deposit of a quarter-million dollars that he sent to
Grenada--and then systematically underreported his income on the
family's tax returns.

When the SEC cease-and-desist order arrived, Wilson stopped working altogether. He asked a different tax preparer to help him out of the mess; that preparer filled out amended returns that Lloyd and his wife Karen signed. The amended returns led to a tax bill of over $540,000; neither Wilson has paid it. The Wilsons divorced, and Karen resumed working outside the home in an insecure and low-paying clerical job. She now seeks relief from the old tax debt.

### FINDINGS OF FACT

The Wilsons married in 1983. Karen Wilson was working as a cashier in a gas station and, apart from a bit of technical training, did not have an education beyond high school. For the first 14 years of their marriage, Lloyd was a self-employed insurance salesman, earning about $30,000 to $36,000 a year. Karen supplemented the family income by working a variety of jobs, eventually becoming a loan officer at the local credit union. The Wilsons had three sons, one of whom is still a minor. And every year Karen would prepare the family's simple joint tax return.

Until 1997. That year the Wilsons' financial situation started changing radically for the better. Lloyd began netting $20,000 a month in his new venture of steering people into a Ponzi scheme called the Venture Fund Group. We specifically find, on the basis of her credible testimony, that Karen did not

understand the nature of her husband's business--she believed it was legitimate and had no knowledge about its operations or fraudulent nature. But its apparent success allowed Karen to leave her job at the credit union to help Lloyd with paperwork and bookkeeping, and to spend more time taking care of the children. With their new earnings, the Wilsons put down $50,000 on two neighboring houses in Modesto, California and took out a mortgage on each. They used one as the family home and the second as Lloyd's office.

Accounting for Lloyd's new business was complicated--the business involved several entities and offshore accounts--and Lloyd turned to Roosevelt Drummer to prepare the Wilsons' 1997 and 1998 joint returns. But Drummer failed to report the substantial income that Lloyd was sending to offshore accounts in the name of a grantor trust.[1] And, in the meantime, the SEC was investigating. In May 1999, an SEC cease-and-desist order put an abrupt end to Lloyd's $20,000-a-month business. Lloyd dumped Drummer and hired John Northup, a licensed CPA, for advice. Northup looked at the Wilsons' 1997 and 1998 returns and told them to get right with the IRS. They took his advice and at the end of 1999 filed amended 1997 and 1998 returns that reported the

---

[1] In the trust world, a grantor is the person who contributes assets to a trust. A grantor trust is created if the grantor retains enough control of or interest in the assets that the trust is ignored for income tax purposes--in other words, the IRS continues to treat the assets as belonging to the grantor.

income Lloyd had been sending offshore.  They also filed their 1999 return.  The three returns showed a total tax liability of $540,000.

Northup knew about the order when he prepared the amended returns, and he discussed it with Lloyd.  Lloyd told Karen about the cease-and-desist order in 2000.  She was credible on this point, and we find it more likely than not that this is true.

Lloyd responded to this unfortunate turn of events by, as Karen described it, spending much of 2000 and 2001 staying at home and doing nothing.  Karen got upset with this behavior; the unpaid bills piled up, and the Wilsons became estranged.  Karen went to work as a clerk at a commercial real-estate company, but she still did not have enough money to move out of the marital home.  At this point, the Wilsons were renting out the other house, so Karen moved to a different bedroom, celebrated holidays separately, and did her best to avoid Lloyd.

While all of this was happening, the tax debt remained unpaid.  In March 2002 Karen submitted IRS Form 8857 seeking innocent-spouse relief for tax years 1997, 1998, and 1999.  Karen requested equitable relief and described her financial status as "of survival."  She also submitted Form 886-A, Innocent Spouse Questionnaire.  On that form she wrote that she was married and still living with Lloyd and that she believed he could pay the

taxes when she signed the returns because Lloyd was "still in business during this time."

The Commissioner's Centralized Cincinnati Innocent Spouse Operation (CCISO) denied Karen's request for relief in a preliminary determination letter in March 2003. CCISO's denial was based on its finding that Karen did not have a reasonable belief that the tax would be paid because there was an outstanding balance from 1998 when the 1999 return was filed. Karen responded to CCISO's preliminary determination letter by sending what she labeled a "statement of disagreement" to the IRS Appeals Office. The IRS Appeals officer handling the case wrote Karen in February 2004, outlining his initial findings based on her questionnaire. The Appeals officer summarized his findings-- based on the limited information in the administrative record-- for each of the numerous factors that the IRS considers in such situations. In March 2004 he also spoke with Karen, who explained that she was filing for divorce from Lloyd but still sharing a house with him. The Appeals officer told her that this would complicate his analysis but that he would contact her again in about three months. Karen filed for divorce the very next month. In July 2004, the Appeals officer mailed Karen a letter asking her to contact him by August 18, 2004 for a telephone hearing. Karen never did, and in September she received a notice of determination denying her request for relief.

The state court judge overseeing the Wilsons' divorce awarded Karen the couple's second house in December 2004, and in early 2005 she evicted the tenant and moved in. She petitioned the Tax Court as a resident of California, and we tried the case in September 2005. Karen did not have the assistance of legal counsel and was even unaware that she could testify.[2] When complicated facts and legal issues unfolded, we arranged for *pro bono* counsel. The Wilsons' divorce became final in 2007. We agreed to reopen the record and held a second trial in 2008 where Karen provided additional testimony.

OPINION

Section 6013(a)[3] lets married couples file their federal tax returns jointly but, if they do, both spouses are then responsible for the return's accuracy and both are generally liable for the entire tax due. Sec. 6013(d)(3); Olson v. Commissioner, T.C. Memo. 2009-294. In some cases, however, section 6015 can relieve a spouse from this joint liability. Relief comes in three varieties: Relief under section 6015(b) or (c) requires either an "understatement" or a "deficiency"; relief under section 6015(f) requires that the requesting spouse be

---

[2] This excerpt from the transcript of the first trial was typical: "Call your first witness, then." "I have no witnesses." "Well, how about yourself?" "Okay." "You count." "I count?" "Yes."

[3] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.

"liable for any unpaid tax or any deficiency." If the liability is neither an "understatement" nor a "deficiency", the only possible relief is under subsection (f). See <u>Hopkins v. Commissioner</u>, 121 T.C. 73, 87-88 (2003).

The Commissioner never asserted a deficiency against Karen, so hers is a case where relief is possible only under section 6015(f). This turns out to be important in considering three preliminary questions:

- jurisdiction;
- standard of review; and
- scope of review.

## I. Jurisdiction to Hear Cases under Section 6015(f)

Karen's case is a "stand alone" nondeficiency case--one where a spouse asks for relief on her own initiative, and not in response to a deficiency action or moves by the IRS to collect a tax debt. After the trial began back in 2005, courts began questioning whether we had jurisdiction over stand-alone nondeficiency petitions. See <u>Commissioner v. Ewing</u>, 439 F.3d 1009 (9th Cir. 2006), revg. 118 T.C. 494 (2002) and vacating 122 T.C. 32 (2004). In <u>Billings v. Commissioner</u>, 127 T.C. 7 (2006), we agreed that we lacked jurisdiction. Instead of dismissing Karen's petition, however, we suspended her case in the expectation that Congress might expand our jurisdiction to include cases like hers. It did, and late in 2006, amended

section 6015(e) to give us jurisdiction over stand-alone nondeficiency cases. Tax Relief and Health Care Act of 2006, Pub. L. 109-432, div. C, sec. 408, 120 Stat. 3061. We then confirmed with the parties that Karen's case was covered by the terms of the new provision's effective date, and now agree with them that we have jurisdiction to review the Commissioner's determination.

## II. Standard of Review

The Commissioner argues that we should review his determination to see if he abused his discretion. But our decision in Porter v. Commissioner, 132 T.C. 203 (2009) (Porter II), is to the contrary. In Porter II, we held that the 2006 amendment to section 6015(e) not only gave us jurisdiction over section 6015(f) claims but changed the standard of review: "[I]n cases brought under section 6015(f) we now apply a *de novo* standard of review * * * ." Porter II, 132 T.C. at 210.

## III. Scope of Review

An earlier opinion, Porter v. Commissioner, 130 T.C. 115 (2008) (Porter I), reexamined our scope of review--i.e., what evidence we look at--in stand-alone nondeficiency cases. The Commissioner continues to argue here that we should limit our review to the administrative record. The Commissioner also argues that even if we do look outside the administrative record in other cases, we should not do so in this one because Karen

failed to provide information that the IRS Appeals officer requested, and that we should limit review to evidence from the first trial.  We note that the Commissioner has preserved these objections, but Porter I and Porter II compelled us to overrule them and apply both a *de novo* standard and scope of review.

A trial *de novo* entails independent factfinding and legal analysis unmarked by deference to the administrative agency.  See, e.g., Morris v. Rumsfeld, 420 F.3d 287, 292, 294 (3d Cir. 2005) (defining "trial de novo" as "without deferring to any prior administrative adjudication" and "entirely independent of the administrative proceedings"); Timmons v. White, 314 F.3d 1229, 1233-34 (10th Cir. 2003) (same); see also Wright & Koch, 33 Federal Practice and Procedure: Judicial Review of Administrative Action, sec. 8332, at 161-62 (2006).

Because our Court has interpreted section 6015(e) to enable us to determine the "appropriate relief" quite independently of what the IRS decides or the administrative record it assembles, we also do not remand innocent-spouse cases to the IRS as a district court might in reviewing administrative-agency action for abuse of discretion when an agency's factfinding or legal analysis goes awry.  See Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); Virk v. INS, 295 F.3d 1055, 1060-61 (9th Cir. 2002).  When such a remand happens, the agency is able to compile a new (or at least supplemental) administrative record,

and judicial review on remand can be done using an abuse-of-discretion standard applied against that record.

But, contrary to the Commissioner's arguments here, remand is not an option in innocent-spouse cases.[4]  In <u>Friday v. Commissioner</u>, 124 T.C. 220, 222 (2005), we held that "whether relief is appropriate under section 6015 is generally not a 'review' of the Commissioner's determination in a hearing but is instead an action begun in this Court."  (Fn. ref. omitted.) <u>Friday</u> is a division opinion.  We must follow it.  See <u>Sec. State Bank v. Commissioner</u>, 111 T.C. 210, 213-14 (1998), affd. 214 F.3d 1254 (10th Cir. 2000); <u>Hesselink v. Commissioner</u>, 97 T.C. 94, 99-100 (1991).

To sum up these preliminary matters:  We hold that we have jurisdiction to decide what relief Karen is entitled to under the Code, and we will make our decision on the basis of the evidence presented to us at trial, without deferring to the findings of the Appeals officer who issued the notice of determination denying relief.

IV.    <u>Equitable Relief Under Section 6015(f)</u>

Section 6015(f) grants relief to a requesting spouse if "taking into account all the facts and circumstances, it is

---

[4] As is always the case in administrative law, general principles yield to any specific governing statute.  See, e.g., <u>Nguyen v. Shalala</u>, 43 F.3d 1400, 1403 (10th Cir. 1994) (outlining specific statutory remedies available to a court reviewing a denial of Social Security disability claims).

inequitable to hold the individual liable." The Commissioner uses Revenue Procedure 2000-15, sec. 4, 2000-1 C.B. 447, 448, as a framework to determine whether to grant equitable relief. We also have followed that revenue procedure in deciding what relief is appropriate.[5] See, e.g., Washington v. Commissioner, 120 T.C. 137, 147-52 (2003); Jonson v. Commissioner, 118 T.C. 106, 125-26 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).

Revenue Procedure 2000-15, sec. 4.01, 2000-1 C.B. at 448, has seven requirements that all spouses requesting relief under section 6015(f) must meet. The Commissioner concedes that Karen meets all seven.

The procedure also has a safe harbor. This safe harbor grants relief to a requesting spouse if she meets three conditions. Id. sec. 4.02, 2000-1 C.B. at 448. The first requires that:

> At the time relief is requested, the requesting spouse is no longer married to, or is legally separated from, the nonrequesting spouse, or has not been a member of the same household as the nonrequesting spouse at any time during the 12-month period ending on the date relief was requested;

---

[5] Karen Wilson filed Form 8857 in March 2002. The procedure in effect when she filed her request for relief was Revenue Procedure 2000-15, 2000-1 C.B. 447. It has been superseded by Revenue Procedure 2003-61, 2003-2 C.B. 296, but the new revenue procedure applies only to requests for relief filed on or after November 1, 2003, or those pending on November 1, 2003, for which no preliminary determination letter had been issued as of that date. Id. secs. 5, 6, and 7, 2003-2 C.B. at 299. We therefore apply Revenue Procedure 2000-15 to this case.

Id. sec. 4.02(1)(a), 2000-1 C.B. at 448.  Karen concedes that she was not divorced or legally separated when she requested relief, but argues that she was no longer part of the same household because she moved to a different bedroom than her husband and tried to avoid him as much as possible.  However, Karen indicated on her Innocent Spouse Questionnaire that she was still married and living together with Lloyd.  Based solely upon the administrative record, Karen would fail the first safe-harbor condition.  Even under *de novo* review Karen would fail the first safe-harbor because she was still married and didn't have a separate household at the time she applied for relief.  In Nihiser v. Commissioner, T.C. Memo. 2008-135, we found that a married couple was "living apart" under Revenue Procedure 2000-15 while still living in the same household.  Our finding was, however, based on the test in section 4.03(1)(a), 2000-1 C.B. at 448, that does not require separate households.  The safe harbor in section 4.02(1)(a), does.  The first safe-harbor condition is not met when a legally married couple continue to live in the same house.

And even keeping separate households wouldn't be enough in the case of a married couple, because those separate households must be maintained for a "12-month period ending on the date relief was requested."  Id.  Karen credibly testified that she became estranged in 2001 and filed for innocent spouse relief in

March 2002. But when did she become estranged in 2001? If she moved into the separate bedroom on or before March 1, 2001, 12 months would have passed; if it happened after March 1, 2001, the requisite period would not be met. She has the burden, and with no testimony or other proof of the move-to-the-bedroom date in 2001, Karen would also fail based on the 12-month requirement. And failing any requirement for the safe harbor is enough to deny relief under its terms. <u>Nihiser</u>, T.C. Memo. 2008-135.

This leaves us with an eight-factor balancing test to apply. Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. at 448-49. The Commissioner may consider other factors, but this is where he starts. <u>Id.</u> ("The list is not intended to be exhaustive.") The eight factors including the one factor not in dispute, which we put in italics, are:

| Weighs for Relief | Neutral | Weighs Against Relief |
|---|---|---|
| Separated or divorced | Still married | N/A |
| Abuse present | No abuse present | N/A |
| No significant benefit[6] | | Significant benefit |

---

[6] Revenue Procedure 2000-15, sec. 4.03, 2000-1 C.B. at 448-49, does not state that the absence of a significant benefit will weigh in a petitioner's favor, but only that receiving a significant benefit will weigh against her. Nonetheless, we decided in <u>Ferrarese v. Commissioner</u>, T.C. Memo. 2002-249 (and other cases cited), that the absence of a significant benefit should be a positive factor.

| Weighs for Relief | Neutral | Weighs Against Relief |
|---|---|---|
| N/A | Later compliance with Federal tax laws | Lack of later compliance with Federal tax laws |
| No knowledge or reason to know taxes would be left unpaid | N/A | Knowledge or reason to know taxes would be left unpaid |
| Economic hardship if relief not granted | N/A | No economic hardship if relief not granted |
| Tax liability attributable to non-requesting spouse | N/A | Tax liability attributable to petitioner |
| Nonrequesting spouse responsible for paying tax under divorce decree | *No divorce decree* | Petitioner responsible for paying tax under divorce decree |

The Commissioner conceded only that the nonrequesting-spouse's-legal-obligation-to-pay-the-tax factor is neutral. That leaves the remaining seven factors in dispute.

A. Marital Status

The first contested factor is Karen's marital status. This factor favors relief if Karen is "separated (whether legally separated or living apart) or divorced" from Lloyd. Id. sec. 4.03(1)(a). On the innocent-spouse questionnaire she submitted to the IRS, Karen stated she was married to and living with Lloyd, and the IRS Appeals officer initially found that this factor weighed against relief. We agree that this factor would be neutral if we looked at just the administrative record. In

contrast to an applicant's marital status in applying for relief under the revenue procedure's safe harbor, her marital status in arguing for relief under the balancing test is not limited to her status when she applied for relief. And because we look at her eligibility for relief *de novo*, we look at her situation as of the time of trial. She credibly testified that her marriage was formally dissolved in April 2007. We therefore find the marital status factor weighs in favor of relief.

### B. Abuse

Karen does argue that Lloyd was frequently angry with her, and suggests that that might be a form of abuse. But we agree with the Commissioner on this point. Karen conceded during the IRS's consideration of her claim that she was not abused, and during the trial presented no specific evidence on the issue.

### C. Significant Benefit

The third contested factor is whether Karen received a significant benefit. This factor weighs against relief if Karen "significantly benefitted (beyond normal support) from the unpaid liability or items giving rise to the deficiency." Id. sec. 4.03(2)(c), 2000-1 C.B. at 449. "A significant benefit is any benefit in excess of normal support." Sec. 1.6015-2(d), Income Tax Regs.

The IRS Appeals officer found in Karen's favor on this issue, and the trial revealed nothing that would change that result.

Since Karen applied for innocent-spouse relief in 2002, significant benefits have not been rolling in. As we already found, Lloyd had stopped working by 2001--failing to provide even "normal support." As a result, Karen is struggling--living modestly in an unairconditioned house in Modesto. The two homes the Wilsons purchased in 1998 still have significant mortgage balances outstanding; and the $250,000 CD from the First International Bank of Grenada, which may or may not be solvent, lists only Lloyd as a beneficiary. Therefore, on both the administrative record and *de novo* review, we find that the lack of a significant benefit weighs in favor of granting relief.

D. <u>Later Compliance with Federal Tax Laws</u>

The fourth contested factor is whether Karen was in compliance with the Federal tax laws. If Karen "has not made a good faith effort to comply with federal income tax laws" for years after those to which her request for innocent-spouse relief relates, then this factor would weigh against relief. Rev. Proc. 2000-15, sec. 4.03(2)(e), 2000-1 C.B. at 449. The administrative record showed that this factor should be neutral because Karen had only small underpayments of tax in 2001 and 2002 that she later paid in full. Trying the case *de novo* lets us glimpse at even later years. Karen testified that she owed approximately $2,000 for the 2004 tax year, but that she intended to resolve the matter. The second trial included no testimony about later

tax compliance, and it remains unclear whether Karen satisfied her 2004 tax liability and remained current for subsequent tax years.

Based upon Karen's pattern of resolving her 2001 and 2002 tax liabilities, we find it probable that she would resolve her 2004 tax liability as well. We find that these minor shortfalls show no bad faith. But it was her burden to produce evidence of her tax compliance, and she did not. We find that this factor, taking into account her lack of bad faith, slightly weighs against relief on *de novo* review.

E. <u>No Knowledge or Reason to Know</u>

The fifth contested factor is Karen's knowledge of the underpayment. This factor weighs against relief if she "knew or had reason to know * * * the reported liability would be unpaid at the time the return was signed." <u>Id.</u> sec. 4.03(2)(b), 2000-1 C.B. at 449.

Based solely on the administrative record, the knowledge factor would weigh against Karen. The IRS Appeals officer wrote Karen, asking her to explain what she knew when she signed the returns. She never did, and so failed to show in the administrative proceedings that she neither knew nor had reason to know of the underpayment.

On *de novo* review, we have more information. The original 1997 return showed $33,909 in taxes due, while the 1998 return

showed $31,384. Considering Lloyd's earnings, the equity in the Wilsons' two houses, the $250,000 CD, and Lloyd's prior tax compliance, we find that Karen reasonably believed that Lloyd would pay the taxes as shown on the original 1997 and 1998 returns. But the 1999 tax return reflected a $98,000 tax liability because the Wilsons followed Northup's tax-return-preparation advice. The Wilsons had already paid $20,000 in estimated taxes, meaning they still owed $78,000 in taxes upon signing. The Wilsons signed the 1999 return on December 30, 1999, when Lloyd was still working but after the SEC had issued the cease-and-desist order. We have already found, however, that Karen did not know about the SEC order until 2000 at the earliest. But even assuming that she knew about the cease-and-desist order and understood that Lloyd would no longer earn $20,000 a month, we find that it would be reasonable for her to believe that the Wilson family's assets, such as home equity and the CD, would be sufficient to pay an extra $78,000 in taxes.

In Billings v. Commissioner, T.C. Memo. 2007-234 (Billings II), an innocent spouse had no knowledge of an underpayment of tax at the time the original returns were signed, but knew that the tax would not be paid when he signed the amended returns. The Commissioner looked to his knowledge when the amended returns were signed, but we noted that the revenue procedure does not tell us "when to measure the knowledge of a requesting spouse who

signed both an original and an amended return." Id. Citing section 6015(f)'s requirement to consider "all the facts and circumstances," we reasoned that the Commissioner's failure to consider knowledge at the time the original return was signed was an abuse of discretion. Thus, looking just at the time the original returns were signed, we find that the knowledge factor weighs in Karen's favor.

Because, however, Karen's knowledge or reason to know changed over time on the *de novo* record, our holding is a bit mixed. We do think that we should, on the strength of Billings II, look to her state of knowledge when she signed the original returns. For the first two years, this means that we would easily hold that the knowledge factor weighs in her favor. For the 1999 tax year, we are less sure, because she signed amended returns for 1997 and 1998 on the same day she signed the original return for 1999. The two amended returns showed about $444,000 in taxes due, and when combined with the 1999 taxes, the total came to over $540,000. We nevertheless conclude from her evident lack of business sophistication and limited education that she still lacked reason to know that Lloyd would fail to pay the taxes owed--after all, in addition to the hundreds of thousands of dollars in additional taxes owed, the amended returns showed close to a million dollars in extra income that Lloyd was not spending at home.

F. Economic Hardship

The next contested factor is whether Karen will suffer economic hardship if she must pay the tax debt. This factor weighs in her favor when satisfaction of the tax liability would cause her to be unable to pay "her reasonable basic living expenses." Sec. 301.6343-1(b)(4), Proced. & Admin. Regs.[7] The Commissioner looks at any information provided by the requesting spouse to arrive at a reasonable amount for basic living expenses. Sec. 301.6343-1(b)(4)(ii), Proced. & Admin. Regs.

The Commissioner argues that the administrative record shows Karen would not suffer economic hardship. The records Karen provided to the IRS show that her monthly income exceeds her expenses by only $114. But because Karen failed to substantiate her expenses as requested by the IRS Appeals officer, the Commissioner argues that he could not have abused his discretion. We agree that if we looked only at the administrative record, we'd have to find that the Commissioner had not abused his discretion in finding that Karen would not suffer economic hardship.

On *de novo* review, the result is different. Karen's credible testimony showed that paying a $540,000 tax debt would render her

_____

[7] To decide whether a spouse seeking relief will suffer economic hardship, the revenue procedure directs us to the test in section 301.6343-1(b)(4), Proced. & Admin. Regs. See Rev. Proc. 2000-15, sec. 4.02(1)(c), 4.03(1)(b), (2)(d), 2000-1 C.B. at 448-49.

unable to meet reasonable basic living expenses.  She lives in a modest Modesto home, but supports a minor son and has run up her credit card balance to $20,000 for necessary expenses.  Taking into account other expenses not included in the administrative record, we find that Karen's expenses do exceed her income.  And even if Karen had an extra $114 a month to spare, this would be grossly insufficient to pay down the tax debt in any meaningful way.

The Commissioner points to Stolkin v. Commissioner, T.C. Memo. 2008-211, to support his argument that a taxpayer who can afford monthly payments will not suffer economic hardship.  In Stolkin, we held that a taxpayer who "had the means to make monthly payments to reduce the tax liability" will not suffer economic hardship.  We find Karen does not have the means to make monthly payments.  The taxpayer in Stolkin had secure monthly disposable income of $600 (after taking into account expenses such as BMW lease payments).  And in Stolkin, the outstanding tax liability was only $55,000.  With $540,000 in outstanding tax liabilities, an uncertain financial future, and a lifestyle that is anything but luxurious, the economic-hardship factor weighs in favor of granting Karen relief.

G. Attribution

The last contested factor is whether the tax liability is attributable to Lloyd.  This factor weighs in favor of relief if

the "liability for which relief is sought is solely attributable" to Lloyd. Rev. Proc. 2000-15, sec. 4.03(1)(f), 2000-1 C.B. at 449.

The Commissioner concedes that the portion of unpaid liabilities attributable to Lloyd weighs in favor of relief; but argues that since Karen did basic clerical work to assist Lloyd and was an employee of his company, a portion of those liabilities is attributable to her. There was little information in the administrative record that sheds any light on attribution, so the IRS Appeals officer assumed that 50 percent of the tax liability was attributable to Karen. If we looked only to the administrative record, this would weigh against relief. But the trial record leads us to find that Karen had no understanding of Lloyd's business. She merely assisted with clerical duties while Lloyd made all the business decisions. We therefore find that the tax liability is entirely attributable to Lloyd.

<u>Conclusion</u>

After our analysis of these contested factors, the table looks like this:

| **Weighs for Relief** | **Neutral** | **Weighs Against Relief** |
| --- | --- | --- |
| Divorced | | |
| | No abuse present | |
| No significant benefit | | |

| Weighs for Relief | Neutral | Weighs Against Relief |
|---|---|---|
| | | Lack of later compliance with Federal tax laws |
| No knowledge or reason to know | | |
| Economic hardship if relief not granted | | |
| Tax liability not attributable to Karen | | |
| | No divorce decree | |

Thus, Karen has five factors weighing in favor of relief and only one weighing against. But the factor weighing against her has little weight; although Karen's compliance was never clearly established, neither was any serious or bad faith lack of compliance. On the other hand, the knowledge factor weighing in favor of relief--an "extremely strong factor," id. sec. 4.03(2)(b) against relief when present--should not be as "heavy" as usual because of the uncertainty involved in determining the state of her knowledge as to the 1999 tax year. With so little weighing against relief, we conclude that relieving her from joint tax liability for the years in question is the appropriate relief under section 6015(f).

Decision will be entered

for petitioner.